**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| SYLVIA SALAS, ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No.    08 C 1614 |
| ) | Judge Blanche M. Manning |
| ) | |
| 3M COMPANY AND SEDGWICK ) | |
| CLAIMS MANAGEMENT SERVICES, ) | |
| INC., ) | |
| Defendants. ) | |

**MEMORANDUM AND ORDER**

Plaintiff Sylvia Salas alleges that defendants 3M Company and Sedgwick Claims Management Services violated her rights under the Family Medical Leave Act, 29 U.S.C. § 2601, and are liable under the common law doctrine of promissory estoppel.[1]  For the reasons stated below, the defendants' motion for summary judgment [68-1] is denied.

**I.    Facts**

*General Background*

Salas is a single mother of three children and has a ninth-grade education.  3M is a diversified technology company, which operates a distribution facility in Aurora, Illinois (referred to herein as "3M or 3M Aurora").  Sedgwick is the third-party disability benefits administrator that administers all 3M employee short-term and long-term disability claims, workers' compensation claims, and FMLA claims.

3M employed Salas from approximately October 1997 until on or about April 12, 2007. During the time period at issue in this lawsuit, Salas worked as a Warehouse Operator in 3M's Aurora, Illinois distribution center.  During all relevant times, Salas' manager was Olga Barajas. As described more fully below, Sedgwick contacted Barajas regarding Salas' FMLA-leave requests at issue.

During her time at 3M and as discussed in more detail below, Salas has received warnings related to her absences.  According to Salas, these absences were due to her own illness

---

[1]In her response to the motion for summary judgment, Salas states that she has elected to "voluntarily dismiss" her promissory estoppel claim.  Thus, the court dismisses the claim with prejudice.

or the illness of one of her children. Jason Becher, Warehouse Operations Manager at 3M, acknowledged that Salas was a satisfactory employee.

Unrelated to this case, in or around 2002, Salas filed a complaint with the Department of Labor alleging that Barajas incorrectly assessed her points for what should have been FMLA-protected absences. The Department of Labor investigated, found a violation and corrected the situation.

Salas alleges that the defendants violated the FMLA by interfering with her FMLA leave. Second, Salas alleges that 3M retaliated against her for exercising her rights under the FMLA by terminating her employment on or about April 12, 2007. Salas' sole claim against Sedgwick is that it wrongly denied her November 2006 and March 2007 requests for FMLA leave.

*3M'S Attendance Control Program*

At all times relevant to this lawsuit, 3M utilized a written attendance policy, titled the Attendance Control Program, which Salas knew of and understood. Salas received training regarding updates to 3M's Attendance Control Program, which were implemented in or around October 2004. The Attendance Control Program states in relevant part: "Using a twelve-month rolling time period, employees will be subject to progressive discipline according to the number of points that are accumulated during that period. The Attendance Control Program consists of four (4) corrective action steps and, if the poor attendance is not corrected, employees will progress through the steps, up to and including termination."

The Attendance Control Program stipulates, and Salas was at all times aware of, the following: (1) An employee who is absent one full-day receives 1.0 occurrence point; (2) an additional 0.5 point is assessed for an absence of one or more additional consecutive days; (3) an employee who is absent a partial day, for an absence of four hours or less, receives a 0.5 point; (4) an employee who is late arriving at the workstation receives a 0.5 point; (5) an employee who overuses their vacation time receives 0.5 a point for partial day over-use and 1.0 point for a full day over-use; (6) an employee who receives a total of 3.0 occurrence points in a rolling 12-month period will be assessed a verbal warning; (7) an employee who receives a total of 4.0 occurrence points in a rolling 12-month period will be assessed a written warning; (8) an employee who receives a total of 5.0 occurrence points in a rolling 12-month period be assessed a final warning and one day suspension; (9) and an employee who receives a total of 6.0 occurrence points in a rolling l2-month period is subject to disciplinary action up to and including termination. Any assessed points fall off the employee's record after 12 months from the date of the absence.

Pursuant to the Attendance Control Program, "[i]f any Control Program step has been reached or passed a 2nd time, within the past twelve months, the consequences for that absence and any subsequent absence" will be advanced an extra step. For example, an employee who accumulates a total of 3.0 points twice in a rolling 12-month period will receive a written warning rather than a verbal warning. The progressive discipline steps are set forth in a four

column table at the end of the Program document that is available to all employees. Column A describes the typical four-step progressive discipline approach, while Columns B-D describe the accelerated approach for situations in which an individual repeats steps in a rolling 12-month period. Every 3M Aurora employee starts out in Column A of the Corrective Action Table within the Attendance Control Program. If an employee reaches or passes a specific step for the second time within a rolling twelve months, they will then be placed in Column B (and so on) and subject to the corresponding corrective action until sufficient points fall off the employee's record due to the passage of time.

Certain absences, such as absences which qualify under the FMLA, do not count toward an employee's point total under the Program. While Sedgwick reviews a FMLA leave application, or an appeal from a FMLA leave denial, 3M Aurora does not assess points for the absence for which FMLA leave is sought. Only if and when Sedgwick conclusively denies FMLA leave in relation to a specific absence does 3M apply points under the Attendance Control Program as necessary.

*3M & Sedgwick's Administration of FMLA Leave*

3M has retained Sedgwick to administer all 3M employee FMLA claims in accordance with state and federal law and all applicable 3M processes and policies. As the administrator of 3M's FMLA claims, Sedgwick is responsible for the intake and analysis of all claims information and documentation. The defendants also assert that Sedgwick is responsible for the communication of all claims information and documentation, but Salas disputes this and notes that on at least one occasion, Sedgwick emailed her manager asking for the manager to communicate information to Salas. Most importantly, Sedgwick is responsible for making the ultimate decision as to whether an FMLA claim should be granted or denied. 3M does not participate in the final decision to approve or deny.

After a 3M employee submits an FMLA leave request to Sedgwick, the assigned Sedgwick Case Manager sends the employee a Notice of Conditional Approval, which is a temporary approval pending final review of the claims. The purpose of the Notice of Conditional Approval is twofold: (1) it conforms to the employer's regulatory requirement to provide notice within, two days of receiving a claim; and (2) it informs the employee that the claim has been received but will require additional information in order to fully analyze the request. 3M asserts that the Notice of Conditional Approval clearly informs the employee that it is not a final determination of the claim, and that he or she must submit certain additional information in order to receive final approval; however, Salas disputes that. The notice directs the employee to submit, within 15 days, all requested and required information substantiating the need for FMLA leave, including, but not necessarily limited to, a Medical Certification for Family Medical Leave form certified by the employee's health care provider.

Throughout this time, the Sedgwick Case Manager is available to the employee to provide guidance, seek clarification, and answer any questions that may come up as the claim is

processed. If an employee provides the necessary information in a timely manner, Sedgwick analyzes the leave under federal and state law and 3M policy, and issues either a final approval or final denial letter based on the information provided. If the employee provides incomplete or otherwise unsatisfactory information, Sedgwick will request additional information. If it is not provided within the required time parameters, conditional approval will be revoked and the claim will be denied.

Defendants have used the conditional approval process consistently since Sedgwick became 3M's third-party disability benefits administrator in 2004. Sedgwick also utilizes an electronic data system called TAMS to log calls and activity related to FMLA claims. TAMS stands for Total Absence Management System. TAMS is also internally referred to as JURIS.

Between 1999 and 2005, Salas was approved for FMLA leave on numerous occasions to care for her children. For example, Salas applied and was approved for FMLA leave for the time periods of March 5, 2004 to April 5, 2004 (3M 000127), April 20, 2005 to April 25, 2005 (3M 000126), and August 30, 2006 to September 5, 2006 (3M 000555). 3M did not attempt to interfere with these multiple leaves or seek to terminate Salas for taking FMLA leave on these occasions. Moreover, while 3M asserts that throughout this period, Salas was never disciplined outside the requirements of the Attendance Control Program, Salas states that she and others who took FMLA leave were placed, upon their return, in more strenuous and less desirable positions.

*Salas' Daughter, Vanessa Robles*

Salas has an adult daughter, Vanessa Robles, currently age 23. Salas testified at her deposition that she had no documentation from a medical provider or anyone else that her daughter was disabled. While Salas attaches to her response to the motion for summary judgment various medical records for her daughter, she does not point to any specific document that indicates that her daughter was disabled or incapable of performing any activities of daily living.

The parties dispute Robles' capabilities. The defendants assert that Robles adequately cares for all of her grooming and self-help needs and that she is capable of utilizing public transportation alone. The defendants further highlight the following facts. In approximately 2004, Robles graduated from high school, earning a high school diploma, after four years. Following her high school graduation, she worked at Jewel Food Stores as a bagger. Following her employment with Jewel Food Stores, Robles attended Joliet Junior College for approximately one year and a half. Throughout all her semesters at Joliet Junior College, she received credit for all of her classes except one. Robles currently attends Lincoln College in Lincoln, Illinois where she is enrolled in Lincoln's freshman and sophomore general liberal arts and sciences curriculum. During her time as a student at Lincoln College, Robles has received a B grade average and made the Dean's list. At the time of Salas' August 19, 2008, deposition, Robles was employed by Burger King, working thirty to forty hours a week operating Burger King's drive-through window. Since Robles graduated high school, she has not been treated or

examined for mental or cognitive issues by a physician or any other specialist.

Salas, on the other hand, contends that Robles cannot cook for herself and cannot follow basic cooking instructions, is incapable of managing her own transportation, becomes confused and lost when attempting to take public transportation, cannot drive, is incapable of dressing herself appropriately, has difficulty putting on her shoes correctly, becomes confused in communication and has difficulty explaining things or understanding context and suffers from severe and uncontrollable shaking which has been diagnosed as "ataxia-like symptoms."  She testified to the following at her deposition:

- that Robles was born premature and suffers from serious cognitive disabilities, which were diagnosed before she started kindergarten.
- Salas tried to place Robles in "mainstream" kindergarten but Robles failed to keep up and Robles was subsequently placed in learning disabled classes and was never integrated into the general student population except for gym class
- Robles underwent neurological testing around the time that she was eight years old
- Salas testified that a doctor who examined Robles' records stated that her limitations were likely caused by a lack of oxygen during birth and that if he had to "name" it, he would state that Robles' condition was cerebral palsy.  As discussed below, this statement is hearsay and cannot be considered by the court on a motion for summary judgment.
- According to Salas, another doctor believed that Robles might suffer from Fragile X Syndrome, but no official diagnosis was made.  Again, this assertion is inadmissible hearsay as discussed more fully below.
- Salas applied for social security benefits on Vanessa's behalf and one of the physician who examined Robles concluded that Robles was disabled and awarded her benefits.  This statement also constitutes inadmissible hearsay.  The benefits ceased when Salas began making too much money to continue qualifying for them.[2]
- Since high school Robles has received assistance from a vocational rehabilitation specialist from the Illinois Department of Health and Human Services.
- Robles now attends Lincoln College and Salas has had to pay "extra tuition" for tutors for Robles in every class
- Prior to attending Lincoln College, Robles attended Joliet Junior College but she could not "keep up" with the curriculum.
- Robles has struggled to hold even remedial jobs.  She was fired from Auntie Ann's pretzel shop because she was not able to "keep up with the

---

[2]This statement is based solely on Salas' deposition testimony and is not corroborated by any documentation.

customers." Robles also tried to work at the Salvation Army but even with the assistance of a job coach, she was unable to "keep up with the productivity requirements"

- 3M allowed Robles to remain on Salas' health insurance past the age of 18 because, according to Salas, of Robles' disability.

Robles' capabilities are discussed in more detail in the Analysis section below.

*Salas' November 2006 and March 2007 FMLA Claims*

In November 2006, Robles was diagnosed with pancreatitis and was hospitalized for approximately 6 days. That same month, Salas made a claim seeking FMLA leave to care for Robles. Salas states that this was the first time that she had requested FMLA leave to care for Robles. Salas states that she told Amanda Sirian, an FMLA specialist at Sedgwick, that Robles had pancreatitis and that she needed intermittent leave to take her to and from doctor's appointments because Robles was "mentally slow" and unable to drive.

During this initial conversation, Salas contends that Sirian told her that she most likely would not be approved for FMLA leave because Robles was over 18 years of age, and recommended that Salas speak with her manager about using vacation or personal time. However, these statements cannot be considered by the court as they are inadmissible hearsay. Salas states further that she did as Sirian suggested and Becher allowed her to take one day of emergency vacation to care for Robles.

In association with Salas' FMLA request, the defendants sent Salas a November 29, 2006, Notice of Conditional Approval, which required her to submit a fully completed Medical Certification form by December 13, 2006. While 3M contends that during a December 4, 2006 phone call, the FMLA Specialist instructed Salas to submit documentation from a health care provider to demonstrate that Robles needed assistance with three or more activities of daily living, Salas asserts that she was never told by anyone verbally or in writing that she needed to provide proof of limitations in activities of daily living. Sedwick's TAMS system contain an entry on that date stating that "EE understood and said that she would speak with professional assistance to see what cares are being provided and also speak with MD to have medical completed. EE understood [activities of daily living]." Despite the Sedgwick Case Manager's request, Salas did not submit any information detailing Robles' limitations. As a result, Sedgwick sent Salas a December 21, 2006, Notice of Denial of Intermittent FMLA Claim. At this time, 3M offered employees a process to appeal, challenge and possibly reverse a denied FMLA claim within 14 days. Salas did not appeal the December 21, 2006, denial of her claim.

At the end of February 2007, Robles' pancreatitis flared again and this time she was hospitalized for 7 days and had surgery on March 2, 2007. Salas states that Robles was given Vicodin and morphine, that she was hallucinating, and that the hospitalization limited Robles' ability to function. Salas asserts that because Robles needed transportation home upon her

release from the hospital on March 2, 2007, Salas missed 1.1 hours of work and was assessed one attendance point due to her absence from work.

On approximately March 5, 2007, Salas states that she took Robles to the emergency room due to pain. Salas contacted Sedgwick and requested FMLA leave.[3] Defendants once again sent Salas a March 7, 2007, Notice of Conditional Approval, which required Salas to submit the necessary information, including a fully completed Medical Certification form, by March 21, 2007.

On March 8, 2007, a Sedgwick FMLA Specialist attempted to contact Salas via phone and, upon getting no answer, left a voice mail for Salas. The Specialist memorialized her voicemail to Salas in TAMS stating: "[L]eft VM (voice mail) information EE that I was calling on FMLA claim as I know her daughter is 21 and that we will need MD to indicate if assistance is needed with [activities of daily living]. Explained [activities of daily living]. Informed her that we will need MD to list all [activities of daily living] that need assistance on medical along with all other information pertaining to daughter's condition. Left name and ext number for any further questions." While Salas does not dispute the entry in TAMS, she contends that no such voicemail was ever left and, moreover, disputes that she was ever asked to present evidence of limitations in activities of daily living.

On or about March 14, 2007, Salas submitted a Medical Certification form to Sedgwick. Sedgwick asserts that it still had no specific information at that time regarding the limitations in her daughter's activities of daily living. Salas, however, asserts that her daughter's doctor, Dr. Adeleye, specifically affirmed that Robles required assistance with basic medical, hygiene, nutrition, safety or transportation and that Salas' presence was necessary or would be beneficial to the care of her daughter.

On March 19, 2007, a Sedgwick FMLA Specialist left a voice mail for Salas and notated TAMS as follows: "Called EE at home, left VM (voice mail) informing EE that medical was received but I will need MD to indicate dates needed for absence along with listed [activities of daily living] that needed assistance. Explained [activities of daily living]. Informed EE that we will need updated medical by 03/28/07 as decision will be made on that date. Left name and ext number for any further questions." While Salas does not dispute that this entry into the TAMS was made, she disputes that any such voicemail message was left for her and also states that she did not have a home phone at that time. Salas also asserts (and the defendants deny) that if Sedgwick believed that the medical certification is incomplete, it must request a "physician advisor review" in which a representative from Sedgwick contacts the employee's doctor and obtains the additional information. Salas states that Sedgwick did not do this.

Sedgwick never provided Salas with written notice that, in addition to the medical

---

[3]It is a bit unclear to the court, but it appears that on March 5, 2007, Salas sought FMLA leave to care for Robles intermittently beginning on March 2, 2007.

certification, she also needed proof of Salas' limitations with respect to the activities of daily living.

On or about March 21, 2007, Salas left a voice mail for her Sedgwick FMLA Specialist. In relation to this call, Sedgwick's TAMS notes state: "Received Vm (voice mail) from EE stating that she only needs to provide her daughter with transportation as she is not able to drive." Salas does not dispute that she left a voicemail message for the FMLA specialist at or around this time, but does dispute the content and states that she had previously and again told the representative that Vanessa had pancreatitis, that she (Salas) had needed intermittent leave to take her to and from doctor's appointments because Vanessa was "mentally slow" and "could not drive." Salas also asserts that she informed Sedgwick that Vanessa has a learning disability and that her daughter has "professional assistance" for her disability.

The defendants state that on March 21, 2007 a Sedgwick FMLA Specialist returned the call, reached Salas, and notated TAMS as follows: "pc (phone call) to ee, ee said she will not pursue updated info needed to clarify her daughter's [activities of daily living], ee said ok for denial and to close claim." Salas denies ever making any such statement. Indeed, Salas states that after she initiated her March 2007 FMLA request, she and Sirian, Sedgwick's FMLA specialist, had 3 phone conversations during which Salas inquired what information was needed for her FMLA claim. Salas further states that during these calls, Sirian never told her what was required and instead became frustrated and told her that unless her daughter was "in diapers" she would not be approved for FMLA leave. Salas also contends that Sirian refused to accept paperwork regarding Robles' learning disabilities and told Salas that it would be a waste of time. Sirian, on the other hand, states that she never spoke to Salas directly until after the claim was denied.

On March 21, 2007, Barajas received an e-mail from Sedgwick in which she was asked to communicate to Salas that the medical information Salas had submitted was insufficient and that Salas had 7 days to submit additional medical information. Sirian admits that this letter and request was never mailed to Salas. Barajas forwarded the e-mail to Becher, but apparently did not communicate the information to Salas. Becher did not take any action with respect to the e-mail.

Salas states that she told Barajas and Becher during her termination meeting that Sirian had refused to accept paperwork regarding Robles and her limitations. Barajas testified that Salas "might have" mentioned something about that at the termination meeting while Becher testified that he did not recall whether Salas mentioned anything about that.

On April 2, 2007, Salas received a Notice of Denial of Intermittent FMLA Claim, which checked a box stating that Salas' request was being denied because her child was "over 18." The April 2, 2007, Notice of Denial informed Salas she could appeal within 14 days.

Salas faxed Sedgwick an April 24, 2007 one sentence appeal of the Notice of Denial.

Although the appeal was late, it was nonetheless referred to a FMLA Appeal Specialist Case 14 for consideration. After Salas had appealed the denial of her claim, the Appeals Specialist, Rhonda Larsen, noted in the TAMS system: "information suggests that employee's 21 year-old daughter may have a condition that would benefit from obtaining clarification from MD-to-MD for what ADL's may be needed other than transportation." Upon review of the appeal, Sedgwick affirmed the April 2, 2007 Denial, at least partially because Salas had failed to establish that her adult daughter met the standard for FMLA coverage. The Appeals Specialist also noted that Salas' appeal was untimely.

*Salas' Attendance Issues and Eventual Termination*

During her employment with 3M, Salas received numerous verbal and written warnings, and was previously suspended, for violations of 3M's Attendance Control Program. On May 2, 2006, pursuant to the progressive discipline requirements of the Attendance Control Program, Salas received a written warning for missing work and having 4.0 absence points in a twelve-month period. The May 2, 2006 written warning also noted that further absences would subject Salas to additional discipline, up to and including termination.

On June 24, 2006, again pursuant to the progressive discipline requirements of the Attendance Control Program, Salas received a Final Warning for poor attendance upon reaching 5 points pursuant to the Program. The warning documentation noted:

> On 5-2-06 you received a written warning about your attendance because you had reached 4 or more attendance points. You were warned that if you reached 5 or 5 1/2 points or repeated step 2 you would receive further disciplinary action. Since you have now repeated step 2, you are being placed on a one day suspension effective 6-26-06. If your level of attendance points reaches 5 or more in a rolling 12 month period, or if you repeat Step 2 in the next 12 months, your employment will be reviewed for termination. Please be aware that this is your final warning.

A 3M human resources representative personally reviewed the specifics of the Attendance Control Program with Salas, and an additional copy of the Program was attached to the June 24, 2006 letter.

As of April 4, 2007, Plaintiff had been absent on the following dates, resulting in the following point assessments: (1) April 17, 2006 full day absence resulting in 1.0 point assessment; (2) April 27, 2006 two-day absence resulting in a 1.5 point assessment; (3) June 20, 2006 two-day absence resulting in a 1.5 point assessment; (4) March 2, 2007 partial day absence resulting in a 0.5 point assessment; (5) March 5, 2007 full day absence resulting in a 1.0 point assessment; (6) March 15, 2007 partial day absence resulting in a 0.5 point assessment. As of April 4, 2007, these absences, taken together, resulted in Salas registering a total of 6.0 points under the Attendance Control Program.

Therefore, the defendants assert that as of April 4, 2007, Salas was subject to termination under the Attendance Control Program because she had accumulated a total of 6.0 points in a rolling 12-month period.  At this time, Salas' March 5, 2007, FMLA leave request had been denied and she had not filed an appeal, although her time to file an appeal had not yet expired. Indeed, Salas states that she should not have been assessed points for her March 2 and 5 absences in that her appeal time had not expired and, thus, should not, under 3M's own policy, been subject to termination.

In light of her previous 5 point warning in June 2006, the March 2007 absences marked the second time Salas had reached 5 or more points in a rolling 12-month period. As such, Salas fell under Column B of the Corrective Action Table within the Attendance Control Program, which provides for termination if an employee reaches 5 points twice within a rolling 12 months. Thus, Salas was subject to termination under the Attendance Control Program with a total of 5.0 points. In fact, she exceeded the termination trigger by accruing six points prior to her consideration for termination.

On or about April 12, 2007, Salas was notified via telephone that 3M was terminating her for repeated violations of the Attendance Control Program.  Jason Becher was employed as the 3M Aurora, Illinois facility Warehouse Operations Manager from on or about March 1, 2006 until approximately May 2007.  Becher was a decision-maker responsible for initiating Salas' termination for excessive absenteeism under the Attendance Control Program.   In order not to interfere with her FMLA statutory rights, Jason Becher waited until Sedgwick denied Salas' March 5, 2007 FMLA leave request before initiating Salas' termination under the Attendance Control Program.

3M contends that at all times relevant to this lawsuit, 3M employees were treated similarly under the Attendance Control Program in regards to assessing points for absenteeism. Salas disputes this but does not know of any similarly situated employees who were treated differently than she was under 3M's Attendance Control Program in regards to the assessment of points for unexcused absences.

## II.    Standard

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The existence of a factual dispute is not sufficient to defeat a summary judgment motion, instead the non-moving party must present definite, competent evidence to rebut the movant's asserted facts. *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir.

2004).

## III.  Analysis

    A.   <u>Is Sedgwick an "employer" under the Act</u>?

The defendants first argue that Sedgwick is not an "employer" as that term is defined under the Act and therefore it cannot be liable for interfering with Salas' FMLA rights.  The FMLA defines an "employer" as "any person engaged in commerce or in any industry or activity affecting commerce who employs 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year" and includes "any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer."  29 U.S.C. § 2611(4)(A).

Under the pertinent regulations:

> Where two or more businesses exercise some control over the work or working conditions of the employee, the businesses may be joint employers under FMLA. Joint employers may be separate and distinct entities with separate owners, managers, and facilities. Where the employee performs work which simultaneously benefits two or more employers, or works for two or more employers at different times during the workweek, a joint employment relationship generally will be considered to exist in situations such as:
> > . . .
> > (2) Where one employer acts directly or indirectly in the interest of the other employer in relation to the employee; . . .

29 C.F.R. § 825.106(a).

As is relevant here, the regulations further state that:

> A type of company that is often called a "Professional Employer Organization" (PEO) contracts with client employers to perform administrative functions such as payroll, benefits, regulatory paperwork, and updating employment policies. The determination of whether a PEO is a joint employer also turns on the economic realities of the situation and must be based upon all the facts and circumstances. A PEO does not enter into a joint employment relationship with the employees of its client companies when it merely performs such administrative functions. On the other hand, if in a particular fact situation, a PEO has the right to hire, fire, assign, or direct and control the client's employees, or benefits from the work that the employees perform, such rights may lead to a determination that the PEO would be a joint employer with the client employer, depending upon all the facts and circumstances.

29 C.F.R. § 825.106(b)(2).

The Seventh Circuit has recently discussed the concept of joint liability in the FMLA context, stating that:

> In assessing the amount of control an employer exercised over an employee, other courts have addressed various factors such as whether the alleged employer "(1) had the power to hire and fire employees, (2) supervised and controlled employee work schedules or conditions of payments, (3) determined the rate and method of payment, and (4) maintained employment records." [The plaintiff] asks us to adopt a similar list of factors that are relevant to the determination of a joint-employer relationship. But we decline to so limit our review in this case or subsequent cases. Although these factors are certainly relevant in deciding whether an employer-employee relationship exists, it would be foolhardy to suggest that these are the *only* relevant factors, or even the most important. Rather, we hold generally that for a joint-employer relationship to exist, each alleged employer must exercise control over the working conditions of the employee, although the ultimate determination will vary depending on the specific facts of each case.

*Moldenhauer v. Tazewell-Pekin Consol. Communications Center*, 536 F.3d 640, 644 (7th Cir. 2008)(citations omitted)(emphasis in original).

The defendants contend that Sedgwick had no impact on Salas' working conditions. They go on to state that "Sedgwick did not have the power to hire or fire Plaintiff, did not supervise and control Plaintiff's work schedule or conditions of payment, did not determine the rate and method of Plaintiff's payment, and did not maintain Plaintiff's employment records." In support of these assertions, the defendants do not point to any of their own statements of fact but instead cite to Salas' deposition. But Salas' testimony in support of this assertion lacks foundation. The defendants fail to set forth how Salas, as an employee, has personal knowledge of the working relationship between 3M and Sedgwick. Indeed, even in her deposition, Salas states that "she personally thought [Sedgwick] w[as] the same as 3M" but came to realize at some undesignated point that they were not. Salas Dep. at 257-58. Thus, the defendants have failed to point to any admissible evidence in support of their argument and the fact-intensive inquiry that the regulations and caselaw require.

For her part, Salas merely responds that Sedgwick was an "employer" under the statutory definition because it acted "directly or indirectly, in the interest of an employer. . . ." 29 U.S.C. § 2611(4). She does not point to any record evidence in support of her assertion and her argument ignores certain of the pertinent regulations cited above. Specifically, the regulation states that "[w]here two or more businesses exercise some control over the work or *working conditions* of the employee, the businesses may be joint employers under FMLA." 29 C.F.R. § 825.106(a). It is undisputed that Sedgwick administered 3M's FMLA claims, so it is fair to say that Sedgwick

exercised some control over Salas' working conditions. Moreover, the regulations specifically address the situation of a professional employer organization that specifically administers benefits for another company. Thus, Salas' sole reliance on the statutory language gives short shrift to the relevant regulations and the analysis required thereunder.

That being said, however, the defendants' failure to point to admissible record evidence in support of their argument prevents the court from deciding this issue at summary judgment. Accordingly, the defendants' motion for summary judgment on this issue is denied.

B.    FMLA Interference Claim

The FMLA allows up to 12 weeks of unpaid leave to care for a loved one who has a serious health condition. 29 U.S.C. §§ 2612, 2615. Under the FMLA, it is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided." 29 U.S.C. § 2615(a)(1). "A claim under the FMLA for wrongful termination can be brought under either a discrimination/retaliation or interference/entitlement theory; the difference is that the first type of claim requires proof of discriminatory or retaliatory intent while the latter requires only proof that the employer denied the employee his or her entitlements under the Act." *Kauffman v. Federal Exp. Corp.*, 426 F.3d 880, 884 (7th Cir. 2005)(citation omitted). In this count, Salas claims that the defendants interfered with her FMLA rights to care for her sick daughter which resulted in the loss of her employment and health benefits for her and her daughter. To prevail on her interference claim, Salas must show that: (1) she was eligible for FMLA protection; (2) the defendant was covered by the FMLA; (3) she was entitled to FMLA leave; (4) she provided sufficient notice of her intent to take leave; and (5) the defendant denied her benefits to which she was entitled. *Ryl-Kuchar v. Care Centers, Inc.*, 565 F.3d 1027, 1030 (7th Cir. 2009)(citation omitted).

1.    *Does the evidence of interference implicate 3M?*

In its reply brief, 3M argues for the first time that Salas' interference claim "is in reality an attempt to indict Sedgwick's claim handling process" and because Salas has failed to raise any genuine issue of material fact that 3M was involved in that process, 3M cannot be liable on the interference claim. Because 3M raises this for the first time in its reply brief, the court will not consider it. *Carter v. Tennant Co.*, 383 F.3d 673, 679 (7th Cir. 2004)(holding that arguments raised for the first time in a reply brief are considered waived).

2.    *Effect of failure to provide written notice*

One of Salas' interference claims is that she was not properly advised that she needed to provide medical documentation regarding her daughter's condition. The regulations promulgated in support of the FMLA state that: "[e]mployers shall provide written notice detailing the specific expectations and obligations of the employee and explaining the consequences of a failure to meet these obligations." 29 C.F.R. § 825.300(c)(1). "Failure to follow the notice requirements

set forth in this section may constitute an interference with, restraint, or denial of the exercise of an employee's FMLA rights."  29 C.F.R. § 825.300(e).  The regulations further provide that:

> [t]he employer shall advise an employee whenever the employer finds a certification incomplete or insufficient, and shall state in writing what additional information is necessary to make certification complete and sufficient.  A certification is considered incomplete if the employer receives a certification, but one or more of the applicable entries have not been completed.

29 C.F.R. § 825.305(c).  Salas alleges that the defendants interfered with her FMLA rights because she did not receive written notice of the need to provide medical documentation showing that her daughter was incapable of self-care with respect to the activities of daily living.

The defendants contend that "multiple verbal notices surely accomplished the same goal as a written notice."  Motion at 13.  Thus, they assert because she cannot demonstrate prejudice, *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 90-91 (2002), she cannot establish interference.  In their reply, the defendants assert that "there was no resulting prejudice from the fact that Sedgwick followed up verbally on the ADLs, since Plaintiff knew from the Conditional Approval that additional information may be required from her in connection with her claim."  Reply at 5.  But while Salas may have been put on notice that Sedgwick might need additional information, it is undisputed that Sedgwick did not provide written notice of the need for information regarding Robles' activities of daily living, and a genuine issue of material fact exists as to whether Salas received oral notice.  Although the defendants point to the TAMS entries in support of their contention that Salas was given oral notice of the need for ADL information, Salas denies that she ever received this information.  Because she did not submit the ADL information for Robles, Salas' request for FMLA leave was denied and she was assessed attendance points which ultimately led to her termination.

Accordingly, the court rejects the defendants' assertion that Salas cannot show, as a matter of law, that she was prejudiced by the failure to provide written notice of the need for supplemental ADL information.  As such, the defendants' motion for summary judgment on this ground is denied.

### 3.    *Was Salas entitled to FMLA leave*?

The defendants next argue that Salas was not entitled to FMLA leave because she has not established that her daughter, Robles, was incapable of self-care due to a mental or physical disability.  Employees are entitled to FMLA leave "to care for the ... son [or] daughter ... of the employee, if such ... son [or] daughter ... has a serious health condition."  29 U.S.C. § 2612(a)(1)(C).  A son or daughter is defined as a child "under 18 years of age; or 18 years of age or older and incapable of self-care because of a mental or physical disability."  29 U.S.C. § 2611(12)(A)-(B).

"Incapable of self-care" means that:

> the individual requires active assistance or supervision to provide daily self-care in three or more of the "activities of daily living" (ADLs) or "instrumental activities of daily living" (IADLs). Activities of daily living include adaptive activities such as caring appropriately for one's grooming and hygiene, bathing, dressing and eating. Instrumental activities of daily living include cooking, cleaning, shopping, taking public transportation, paying bills, maintaining a residence, using telephones and directories, using a post office, etc.

29 C.F.R. § 825.122(c)(1).

The defendants assert that apart from her own "self-serving" testimony, Salas has not adduced any evidence establishing that her daughter required active assistance or supervision to provide daily self-care in three or more of the ADLs or IADLs at the time of her FMLA claim. The defendants point to evidence which they assert establishes as a matter of law that Robles was capable of self-care, including that she graduated from high school, took classes at a junior college and currently attends a different local college where she has qualified for the Dean's List. They also note that she has held more than one job, including a current position at Burger King where she works during the lunch and dinner rush hours, and has consistently adequately cared for all of her grooming and self-help needs.

Salas responds that Robles was necessarily limited in every ADL and IADL while she was hospitalized on March 2 and March 5, 2007. According to Salas, because the FMLA's definition of a "serious medical condition" (which would be sufficient to provide an employee with FMLA leave) includes inpatient care and any subsequent treatment in connection with such inpatient care, then Robles' hospitalization must have limited her ADLs and IADLs. In support, Salas points to *Bryant v. Delbar Prods.*, 18 F. Supp. 2d 799, 803 (M.D. Tenn. 1998), in which the court concluded that the plaintiff's son was incapable of self-care while he was hospitalized for kidney failure. *Id.* ("[I]t is only logical to conclude that Howard Bryant could not cook, clean, shop or take public transportation (more than three IADLs) while he was in the hospital."). She additionally notes that while in the hospital Robles was confined to bed and having hallucinations.

Salas further argues that Robles was incapable of self-care during her post-hospitalization period. Robles' doctor, Victoria Adeleye, completed a medical certification on March 13, 2007, on which she checked the "yes" box in response to the question: "Does or will the patient require assistance for basic medical, hygiene, nutrition, safety, or transportation needs?" In addition, she responded "yes" to the question "Is this employee's presence necessary or would it be beneficial for the care of the patient?" The form also indicated that the frequency of absence needed for treatment was 2 to 3 days per week for 3 months.

The court agrees with the *Bryant* case and concludes that Robles was incapable of self-

care at least during the days on which she was hospitalized.  Moreover, based on the health care provider's certification, Salas has come forward with competent evidence demonstrating that Robles was incapable of self-care during the post-hospitalization period (which is left undefined).  The question then becomes whether she was incapable of self-care "because of a mental or physical disability."

The applicable regulations define physical or mental disability as:

> a physical or mental impairment that substantially limits one or more of the major life activities of an individual.  Regulations at 29 CFR § 1630.2(h), (i), and (j), issued by the Equal Employment Opportunity Commission under the Americans with Disabilities Act (ADA), 42 U.S.C. 12101 et seq., define these terms.

29 C.F.R. § 825.122(c)(2).  "Substantially limits" is defined as follows:

> (j) Substantially limits--
>
> (1) The term substantially limits means:
> (i) Unable to perform a major life activity that the average person in the general population can perform; or
> (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.
> (2) The following factors should be considered in determining whether an individual is substantially limited in a major life activity:
> (i) The nature and severity of the impairment;
> (ii) The duration or expected duration of the impairment; and
> (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.

29 C.F.R. § 1630.2(j).

Unfortunately, neither of the parties specifically applies the above definition of "substantially limits" to the facts of this case.  Rather, the parties discuss the definitions of "incapable of self-care" and "disability" (which is turn is defined by whether an individual is "substantially limited") as if they are one and the same without distinguishing between the two.

This is understandable in that both refer to an individual's abilities with respect to daily life activities.  However, in order for Salas to have been entitled to FMLA leave, she must show that she was taking the requested time to care for her daughter as that term is defined by the FMLA and its supporting regulations.  As already noted, because Robles was over the age of 18, Salas must show that Robles was "incapable of self-care because of a mental or physical

disability." To be incapable of self-care means that the individual requires "active assistance or supervision" with three or more activities of daily living or instrumental activities of daily living. However, the over-18 daughter must also be incapable of self-care *because of a mental or physical disability,* as that term is defined by the applicable regulations. This latter part of the definition is a separate requirement from being incapable of self-care. Yet the parties do not separately discuss these two different concepts.

Indeed, in their opening brief, while the defendants initially assert that Salas cannot point to any evidence that Robles was "'incapable of self-care' due to [a] "physical or mental disability,'" they go on to expressly discuss only whether Robles was incapable of self-care. In so doing, however, they cite to the *Murphy* case, which turned on whether the son had a disability (*i.e.*, was substantially limited in a major life activity). In a similar vein, Salas contends that "even if this Court were to find that Vanessa's hospitalizations and recovery period did not render her incapable of self care, her permanent cognitive disabilities certainly did." Response at 12. Again, this statement demonstrates that Salas appears to be conflating the concepts of incapable of self care and disability.

Having noted this lack of specificity on the part of the parties, the court has attempted to construe the parties' arguments and analyze the relevant issues to the best of its ability based on the record.

To the extent that Salas seeks to show that Robles was disabled based on her daughter's pancreatitis, for which she was hospitalized, the court agrees with the defendants that Salas has failed to meet her burden. The Supreme Court has held that "substantial limitation" requires that the "impact of the impairment must be permanent or long term." *Toyota Motor Mfg., Inc. v. Williams*, 534 U.S. 184, 198 (2002).[4] Here, Salas has not pointed to any evidence suggesting that the impact of the pancreatitis was permanent or long term. Indeed, the medical certification from Robles' doctor indicates that she would need assistance only for 3 months for 2 or 3 days a month. Accordingly, to the extent that Salas seeks to satisfy the definition of disability by

---

[4]"On September 25, 2008 the Congress enacted the ADA Amendments Act of 2008 (ADAA) in order to 'reinstat[e] a broad scope of protection' under the ADA and to 'reject' the holdings in *Toyota Motor Mfg., Ky. v. Williams*, 534 U.S. 184, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002), and *Sutton v. United Air Lines*, 527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999). The Congress delayed the effective date of the ADAA to January 1, 2009." *Lytes v. DC Water and Sewer Authority*, --- F.3d ----, 2009 WL 2152427, at *2 (D.C. Cir. Jul. 21, 2009)(citations omitted). However, the court will apply the laws and regulations applicable at the time of the complained-of conduct. *Kiesewetter v. Caterpillar Inc.*, 295 Fed. Appx. 850 (7th Cir. 2008)(declining to apply ADA amendments to that appeal and stating that "[w]e use the laws and interpretations that were in force when the complained-of acts occurred.")(citation omitted).

pointing to her daughter's pancreatitis, Salas has failed to meet her burden. Thus, summary judgment as to this aspect of Salas' claim is granted.

Salas, however, also contends that her daughter suffered from "permanent cognitive disabilities." In support, Salas initially states that one doctor diagnosed Robles with cerebral palsy and another doctor diagnosed Robles with Fragile X Syndrome. However, as to the claims, the court notes that Salas appears to have misstated the record. Regarding the purported cerebral palsy diagnosis, Salas testified that an unnamed doctor "went through my pregnancy records" and "everything of Vanessa's, and he said the best conclusion that he had about Vanessa was lack of oxygen during birth that cut off brain cells." *Id*. at 104-05. Salas further testified that the doctor indicated that if he "had to choose a name, [he] would figure somewhere in about maybe cerebral palsy but [he couldn't] say for certain." *Id*. at 105. Not only is Salas' testimony in this regard hearsay but it also does not demonstrate whether Robles was substantially limited in a major life activity. As to the Fragile X Syndrome, Salas specifically testified that while doctors speculated that Robles may have had Fragile X Syndrome, they never actually made a determination on the issue. Salas Dep. at 104. Thus, the court does not credit Salas' statements regarding cerebral palsy or Fragile X.

Salas, however, goes on to state that Robles' "cognitive disabilities" substantially limited her major life activities. Under the applicable regulations, major life activities means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working. 29 C.F.R. § 1630.2. Salas asserts that Robles was limited as follows:

- Robles "has struggled with basic learning and comprehending" such that every class she took in school was through special education
- Robles cannot cook for herself and cannot manage public transportation without becoming confused, lost and disoriented
- Robles cannot drive
- Robles has "largely been unable to hold a job"
- Robles is now attending Lincoln College where she needs a tutor for every class

Response at 12. Based on these statements, the court construes Salas' argument to be that Robles was substantially limited in caring for herself (i.e., cooking), learning and working. While Salas mentions driving, the Seventh Circuit has held that driving is not a major life activity nor is getting to and from work assignments. *Yindee v. CCH Inc.*, 458 F.3d 599, 601 (7th Cir. 2006); *Sinkler v. Midwest Property Management Ltd. Partnership*, 209 F.3d 678, 685 (7th Cir. 2000).

"[A] substantial limitation in cooking-no matter how severe-will not rise to the level of a substantial limitation in caring for oneself absent evidence of limitations in other areas of caring for oneself." *Storey v. City of Chicago*, 263 Fed. Appx. 511 (7th Cir. 2008)(citation omitted). Although not set forth in her brief, Salas asserts in her statement of additional facts that Robles is

incapable of dressing herself appropriately and has difficulty putting on her shoes correctly. The defendants admit that Salas so testified and do not point to any evidence refuting this testimony. Thus, Salas has pointed to evidence that Robles is substantially limited in another area of caring for oneself (i.e., dressing). As for the cooking, the defendants deny Salas' testimony that Robles cannot follow basic cooking instructions noting that Robles works at Burger King, a fast food restaurant. But this contention simply creates a genuine issue of material fact that must be resolved by the factfinder.

Because Salas has demonstrated that a genuine issue of material fact exists as to whether Robles was substantially limited in at least one major life activity and, if so, is thus disabled, such that Robles would meet the definition of "daughter" under the applicable FMLA regulations, the court denies the defendant's summary judgment motion that the defendants did not interfere with Salas' FMLA rights because she was not entitled to FMLA leave.

B.    FMLA Retaliation Claim

The FMLA makes it unlawful for an employer to "interfere with, restrain, or deny" an employee's attempt to exercise her FMLA rights or to discriminate against an employee who exercises her rights. 29 U.S.C. §§ 2615(a)(1) -(2). Although the basis for this claim is not entirely clear to this court, it appears that Salas alleges that 3M retaliated against her by terminating her for exercising her rights under the FMLA. The court "evaluate[s] a claim of FMLA retaliation the same way that [it] would evaluate a claim of retaliation under other employment statutes" and the plaintiff may proceed under either the indirect or direct methods of proof. *Buie*, 366 F.3d at 503. In her response to the defendants' motion for summary judgment, Salas concedes that she cannot establish retaliation under the indirect method of proof and instead argues that she can show retaliation under the direct method. "A plaintiff can prevail under the direct method by showing an admission of discrimination or by 'constructing a convincing mosaic of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker.'" *Ridings v. Riverside Medical Center*, 537 F.3d 755, 771 (7th Cir. 2008)(citation omitted).

Salas contends that she can create the "convincing mosaic" under the direct method, and points to the following pieces of evidence. First, Salas testified at her deposition that "there were a few times that I had some emergency situations with the children, and [Barajas] told me repeatedly that my job came before my family and I said I do not agree with you." Salas Dep. at 184.[5] As an initial matter, "an FMLA retaliation claim requires proof that a decisionmaker has

_____

[5]In her brief, Salas asserts that Barajas "regularly complained about her employees taking FMLA leave and frequently counseled Salas that her job needed to come before her family." Response at 13. The court again notes that this sentence does not accurately reflect Salas' testimony at the cited deposition pages. *See* Plaintiff's Statement of Additional Fact, ¶ 4. Salas did not testify that Barajas "regularly complained about her employees taking FMLA leave." Indeed, in her deposition, when Salas was asked whether Barajas' comments that her job had to

acted for a prohibited reason." *Hall v. City of Aurora*, No. 06 C 6011, 2008 WL 4877156, at * (N.D.Ill. Jun. 13, 2008)(citation omitted). Salas does not point to any evidence indicating that Barajas was the decisionmaker who decided to terminate Salas or that Barajas had any input in the decision to terminate her.[6] "[Barajas'] actions and statements, therefore, do not help [Salas], because expressions of discriminatory sentiments (assuming that this is what they were) by someone who was not involved in making an employment decision have no bearing on the ultimate issue: whether the decision was the result of discrimination." *Id.* (citation omitted). Even if Barajas did have input, Salas does not indicate how many times Barajas purportedly made this comment to her, but, in any event, comments that one's work comes before family does not supply an inference that she was terminated because she requested FMLA leave. *See, e.g., Boring v. World-Gym*, 06 C 3260, 2009 WL 703385, at * 11 (N.D. Ill. Mar. 19, 2009)(business owners comments that he did not like sick people and his repeated remark "if you were a horse they'd shoot you" did not "supply inferences that [the plaintiff'] leave from work to attend her appointments motivated [the] decision to terminate her."). This is particularly true in light of the fact that in 2005, 2005, and 2006, Salas had been approved FMLA requests while Barajas was her manager.

Second, Salas testified that warehouse workers at the Aurora facility were consistently placed in order-filling positions upon their return from FMLA leave. According to Salas, these positions were more physically demanding than other positions and viewed as punishment for having taken FMLA leave. In her deposition testimony, Salas stated that she spoke to a woman named Cassandra (unidentified in the transcript but who appears to work at 3M) and asked her "in what way were you actually harassed by . . . Barajas on FMLA or had any issues with FMLA. . . ." Salas Dep. at 119. The woman stated to Robles that "when you would come back from work they would reassign you." *Id.* When counsel then asked Salas at the deposition who had been reassigned to order-filling after taking FMLA leave, Salas named two women, Doreen Haas and "Roselind," no last name provided. According to Salas, "everyone" knew that Haas had been assigned to order-filling because she had taken FMLA leave. As for Roselind, Salas testified that she worked in both receiving and order filling but that she "usually" worked in order-filling when she came back from FMLA leave.

As an initial matter, the relevance of the evidence is questionable given that there is no indication that Salas was ever placed in order-filling in retaliation for having taken FMLA leave. In any event, even assuming such an assertion is peripherally relevant to show a general atmosphere or retaliation for taking FMLA leave, Salas provides no foundation for her testimony. In other words, Salas fails to indicate that she had specific personal knowledge of these two

---

come before her family were in connection with FMLA leave, Salas repeatedly stated that she could not remember. Salas Dep. at 185-186.

[6]Indeed, it is undisputed that Becher was the decisionmaker who initiated the termination process for Salas due to excessive absenteeism. *See* Plaintiff's Response to Defendants' Local Rule 56.1 Statement of Material Facts, ¶ 48, Dkt. #67.

women's circumstances such that she can competently testify that they took FMLA leave on particular dates and were definitively assigned to order-filling on their return. Indeed, it appears from the record that she is testifying to what she "heard" about these two women, which is clearly inadmissible hearsay.

Third, Salas argues that 3M's absentee policy is neither mandatory nor no-fault and is actually discretionary because 3M retains the right to deviate from the policy at its discretion. According to Salas, despite the flexible policy and despite Salas having told both Becher and Barajas that she had tried to submit information to Sedgwick but that Sedgwick would not accept it, Becher still fired her without looking into whether the FMLA process had been handled properly. Salas' assertion that this proposition constitutes circumstantial evidence of discrimination/retaliation, however, is complete speculation which finds no support in the record. Salas points to no other employees who were granted deviations from the policy under circumstances similar to hers. Accordingly, the court rejects Salas' proposition that Becher's failure to exercise his discretion in a manner that was favorable to her is circumstantial evidence of discrimination/retaliation.

Salas has more luck, however, with the other pieces of evidence to which she points in support of her mosaic of circumstantial evidence. Specifically, Salas argues that although 3M's policy is to not assess attendance points until after the time to appeal the denial of FMLA leave expires, 3M did not abide by its policy and two days after the denial and 12 days before the time to appeal had passed, assessed attendance points. It then terminated her two days before the appeal deadline passed. According to Salas, Becher's disregard of company policy shows that it intended to fire her regardless of the outcome of her FMLA appeal and that the reason 3M gave for firing her (that she violated 3M's attendance policy) is pretextual.

3M responds that it did not violate its own policy, stating that:

> in conformance with [its] practice, when 3M assessed Plaintiff points under the Attendance Control Program and eventually terminated her, Sedgwick was not reviewing Plaintiff's FMLA leave application, nor was it reviewing an appeal from her FMLA leave denial. Despite Plaintiff's insistence, 3M's policy does not restrict 3M from assessing points for absences or terminating an employee before the appeal deadline expires where there is no appeal pending.

Reply at 13. However, 3M's position appears to be at odds with its statement of fact number 13, undisputed by Salas, which states that:

> Certain absences, such as absences which qualify under the FMLA, do not count toward an employee's point total under the Program. While Sedgwick reviews a FMLA leave application, or an appeal from a FMLA leave denial, 3M Aurora does not assess points for which FMLA leave is sought. Only if and when Sedgwick conclusively denies FMLA leave in relation to a specific absence does

3M apply points under the Attendance Control Program as necessary.

3M's position that it did not violate its own policy is puzzling in light of the final sentence of its statement of fact number 13, which again states that "[o]nly if and when Sedgwick conclusively denies FMLA leave in relation to a specific absence does 3M apply points under the Attendance Control Program as necessary." While an appeal may not have been technically pending at the time that 3M assessed the points, it did not wait until the time to appeal was over. Salas still had time to file an appeal but 3M cut her off by assessing the points before the time to appeal had passed. Thus, 3M contradicted its own policy in that it did not wait until Sedgwick "conclusively denied" FMLA leave before it assessed points.

This brings the court to 3M's fallback argument that even if it failed to follow established policy by processing Salas' termination prior to the passage of her time to appeal, the early termination did not prejudice Salas since Salas' request for FMLA leave was ultimately denied. But whether Salas was prejudiced misses the point of this argument, which is that 3M's failure to abide by its own policy is evidence of discrimination. The court agrees that 3M's failure to abide by its policy of waiting until Sedgwick had "conclusively" ruled on the FMLA may be deemed evidence of discrimination by the trier of fact.

This evidence, when viewed in conjunction with two other pieces of evidence, creates a sufficient mosaic such that Salas survives summary judgment as to her discrimination claim. In particular, Salas asserts that Barajas and the warehouse operations manager, Becher, refused to communicate necessary information to Salas about her leave. Specifically, she asserts that Barajas failed to forward an email sent to her from Sedgwick stating that the medical information that it had received from Salas was insufficient. According to Salas, Barajas neglected to forward the e-mail to Salas knowing that if Salas did not receive FMLA leave for the March 2 and 5 dates, she would have accumulated enough attendance points to have been terminated. In a similar vein, Salas notes that although Barajas had the discretion to do so, she rejected Salas' request for a shift change on the March 2 and 5 dates. Had Barajas granted the request, Salas would not have had to miss work and would not have been assessed the attendance points which led to her termination.

Viewing these facts together, the court concludes that Salas has created a sufficient mosaic of circumstantial evidence in support of her retaliation claim. Accordingly, the defendants' motion for summary judgment as to Salas' retaliation claim is denied.

## IV.    Conclusion

For the reasons stated herein, the defendants' motion for summary judgment [68-1] is denied.  This case is scheduled for a status on September 3, 2009, at 11 a.m. in order to set a trial date.

**ENTER:**

**DATE:** August 25, 2009

_____
**Blanche M. Manning**
**United States District Judge**